IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>     Plaintiff,<br><br>     v.<br><br>ALLAN JOSUE FUNEZ OSORTO,<br><br>     Defendant. | Case No. 19-cr-00381-CRB-4<br><br>**ORDER REJECTING PLEA AGREEMENT** |

Must a term of imprisonment be set in stone, no matter what happens after it is imposed? Should a court be able to reduce a sentence when unforeseeable tragedies change its consequences? What if the defendant's children are effectively orphaned by the death of their other parent? What if a debilitating injury makes it impossible for the defendant to care for him or herself in prison, or recidivate outside of it? What if a terminal diagnosis turns a brief term of imprisonment for a minor crime into a life sentence? What if a global pandemic poses a mortal risk to an immunocompromised inmate who nobody intended to die in jail? When should a court be able to consider such events and revise a previously imposed sentence accordingly? How difficult should it be for a defendant to request this type of relief?

Congress has provided one set of answers to these questions, in the First Step Act of 2019. See 18 U.S.C. § 3582(c)(1)(A). The United States attorney's office has very different answers in this case, for this defendant. See Plea Agreement (dkt. 206) ¶ 5. Because those answers undermine Congressional intent and all but foreclose this defendant's ability to request a critical form of relief, the Court rejects the proposed Plea Agreement.

I.     **BACKGROUND**

Allan Josue Funez Osorto is charged with conspiring to distribute controlled substances, in

violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B). Superseding Information (dkt. 204). Funez Osorto has pled guilty. See Plea Agreement. The Court must decide whether to accept or reject the proposed Plea Agreement.

## II.    LEGAL STANDARD

Courts have broad discretion to accept or reject a proposed plea agreement. In re Morgan, 506 F.3d 705, 708 (9th Cir. 2007). A plea agreement can be rejected for reasons other than a finding that it was not entered into voluntarily and knowingly. See id. at 711.

## III.    DISCUSSION

This plea agreement, like all plea agreements, requires the Defendant to forgo numerous rights guaranteed by statute or the Constitution: the right to a trial by a jury of his peers, to testify on his own behalf, to confront his accusers, to pursue additional discovery from the Government, and so on. Plea Agreement ¶¶ 3–5. This Order focuses on just one of these sacrifices. The proposed agreement states "I agree not to move the Court to modify my sentence under 3582(c)(1)(A) until I have fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring such a motion on my behalf, unless the BOP has not finally resolved my appeal within 180 days of my request despite my seeking review within ten days of each decision." Id. ¶ 5. Because this waiver provision undermines Congressional intent and is an unconscionable application of a federal prosecutor's enormous power to set the terms of a plea agreement, the Court cannot approve of the proposed Plea Agreement in this case.

To understand the Court's objections, it is necessary to understand the practical implications of the waiver provision. 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment upon motion of the Director of the Bureau of Prisons or the defendant. This form of relief, known as compassionate release, is granted when it is consistent with the sentencing factors from 18 U.S.C. § 3553(a) and warranted by either "extraordinary and compelling reasons" or the statute's age-based guidelines.[1] Any reduction in sentence under

---

[1] Specifically, if the defendant is at least seventy years old, has served at least thirty years in prison for the offense for which he or she is currently imprisoned, and is not a danger to another person or the community. 18 U.S.C. § 3582(c)(1)(A)(ii).

§ 3582(c)(1)(A) must also be consistent with applicable policy statements issued by the United States Sentencing Commission.

The circumstances that the Sentencing Commission has found constitute "extraordinary and compelling reasons" illustrate the consequences of the waiver provision at issue here. They include chronic illness, disability, or aging that makes it impossible for the defendant to care for him or herself while incarcerated, terminal illness, and family tragedies that render the defendant the sole caretaker for an incapacitated partner or minor children. U.S.S.G. § 1B1.13 cmt. n. 1(A)–(D). Compassionate release is an avenue for courts to reconsider the length of a term of imprisonment on account of unforeseen tragedy.

A defendant can move for compassionate release in two circumstances. First, if he or she "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). Second, after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." Id.

The proposed Plea Agreement forecloses the second avenue for Funez Osorto to request compassionate release. Plea Agreement ¶ 5. True, he may move for compassionate release if the BOP fails to resolve his appeal within 180 days of his request, assuming he sought review within ten days of each earlier decision. Id. This is hardly comparable to the statutory provision allowing him to bring his own motion for compassionate release after thirty days of inaction by the BOP on an initial request. It seemingly requires at least one appeal,[2] plus half a year of inaction by the BOP, rather than one month. The lengthier wait would be significant in any case and devastating for a person with a terminal illness or children left uncared for.

Requiring Funez Osorto to exhaust all administrative rights to appeal the BOP's failure to bring a motion for compassionate release, or wait 180 days to bring his own motion, meaningfully limits his ability to seek relief under § 3582(c)(1)(A). BOP regulations require two levels of appeal from a warden's refusal to bring a compassionate release motion. 28 C.F.R. § 542.15(a).

---

[2] In addition to the shortcomings described below, this provision is confusing. What if the BOP fails to rule on Funez Osorto's initial request, meaning there is no appeal to leave unresolved? The Plea Agreement does not say, and the Court does not relish the prospect of one day having to divine an answer.

After the Warden refuses a defendant's initial request, the defendant must "submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." Id. If the Regional Director denies the appeal, the defendant must "submit an appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response."[3] Id. Only when the General Counsel denies the defendant's appeal is the administrative process complete. Id. The regulations say nothing about when the warden, Regional Director, and General Counsel must resolve a defendant's requests or appeals, so the timeline they contemplate for administrative exhaustion may fairly be characterized as indefinite. But they have plenty to say about the form of each appeal: the forms that must be used, the documents that must accompany those forms, who the forms must be mailed to, what content must (and must not) be included, and the exact dimensions of any addendum, in case the required form is too small. Id. § 542.15(b). Exhausting administrative remedies is no mean feat. And, like the 180-day lapse contemplated by the Plea Agreement, the additional time exhaustion requires beyond thirty days will be significant in every case and devastating in many.

That fact is reflected in the motions for compassionate release received by this Court. This Court has granted three motions for compassionate release in the last month. See Order Granting Motion for Compassionate Release, United States v. Reid, No. 17-cr-00175-CRB (N.D. Cal. May 5, 2020), ECF No. 554; Order Granting Compassionate Release, United States v. Morrison, No. 18-cr-00238-CRB (N.D. Cal. Apr. 29, 2020), ECF No. 72; Order Granting Compassionate Release, United States v. Trent, No. 16-cr-00178-CRB (N.D. Cal. Apr. 9, 2020), ECF No. 106. None were brought by the BOP, and in each case the defendant was authorized to bring a § 3582(c)(1)(A) motion on his own behalf because thirty days had lapsed since he requested relief from the warden of his facility—not because he had successfully exhausted his administrative remedies. See Order Granting Motion for Compassionate Release at 3, Reid, No. 17-cr-00175-

---

[3] Recall that the plea agreement requires Funez Osorto to appeal within ten days of each decision to take advantage of the 180-day lapse exception to the exhaustion requirement. Plea Agreement ¶ 5. In this way it imposes even more stringent requirements on the already rigorous procedures a defendant must abide by to exhaust his administrative remedies.

4

CRB, ECF No. 554; Bischof Decl. ¶¶ 2–3, Morrison, No. 18-cr-00238-CRB, ECF No. 64; Order Granting Compassionate Release at 2–3, Trent, No. 16-cr-00178-CRB, ECF No. 106.  It appears this is true of most and perhaps all compassionate release motions filed in this district.  See, e.g. Order Granting Emergency Motion for Release at 4, United States v. Burrill, No. 17-cr-00491-RS-2 (N.D. Cal. Apr. 10, 2020), ECF No. 308.  If this Court has received a motion for compassionate release brought by the BOP or a defendant who exhausted his or her administrative remedies, it cannot find or recall the case.

The point is this: while the Plea Agreement leaves open a path to compassionate release, it is hardly wider than the eye of a needle.  It is far narrower than the avenues to relief provided by § 3582(c)(1)(A), and too narrow to provide meaningful relief in many of the circumstances that would render Funez Osorto eligible for relief.  And there is no doubt the Government would rely on the waiver provision to deny Funez Osorto compassionate release.  It has recently attempted to do exactly that in another case before this Court.  See United States's Opp'n to Defendant's Motion for Compassionate Release from Custody at 2, Trent, No. 16-cr-00178-CRB, ECF No. 108 ("Defendant's plea agreement waiver of the right to seek § 3582 relief should be enforced.  His motion [for compassionate release] should be denied on the ground of waiver alone.").  That result is unacceptable for two reasons.  First, it undermines Congress's intent in passing the First Step Act.  Second, it is inhumane.

A brief history of compassionate release is helpful for understanding why the waiver provision is contrary to congressional intent.  Compassionate release was introduced by the Parole Reorganization Act of 1976.  Shon Hopwood, Second Looks & Second Chances, 41 Cardozo L. Rev. 83, 100 (2019).  Originally, only the BOP could move for a reduced term of imprisonment.  Id.  18 U.S.C. § 3582(c) was enacted by the Comprehensive Crime Control Act of 1984.  Id. at 101.  Once again only the BOP was authorized to bring a motion for compassionate release.  Id.

It became clear over the course of the next two and a half decades that compassionate release had, put generously, fallen short of its potential.  A 2013 report by the Department of Justice Office of the Inspector General painted a damning picture, concluding that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be

United States District Court
Northern District of California

eligible candidates for release not being considered." Dept. of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program 11 (2013) ("Inspector General Report"). From 2006 to 2011, an average of just twenty-four defendants were granted compassionate release each year. Id. at 1.

This dismal record was partly attributable to the BOP's application of the "extraordinary and compelling reasons" standard. "[T]he BOP did not approve a single non-medical compassionate release request from 2006 through 2011." Id. at 20. And even dire medical conditions often failed to convince the BOP to bring a motion for compassionate release, as demonstrated by an unsuccessful request brought on behalf of a defendant in a near vegetative state. Id. at 24. Although the defendant was fed through a tube and bathed, toileted, and repositioned by staff, the request was denied because his condition was not "terminal." Id. Indeed, the Inspector General found that in general the only requests given serious consideration were for inmates with life expectancies under twelve months. Id. at 29.

The problem was compounded by the BOP's failure to establish "timeliness standards for reviewing [initial] compassionate release requests" or account for "the special circumstances of medical compassionate release requests" in its timeliness standards for appeals. Id. at 27. The timeframe for reviewing initial requests varied wildly from facility to facility, ranging from five to sixty-five days. Id. at 28. After that, the appeals process could take as long as five months. Id. at 27–28. Before submitting an appeal, a defendant had to attempt to informally resolve his or her concern with facility staff. Id. at 28–29. There was no defined timeframe for informal dispute resolution. Id. at 29. The next step was "a formal written administrative remedy request" submitted to the Warden, who had twenty days to respond. Id. After that the defendant could appeal to the Regional Director, who had thirty days to respond, and from there to the BOP's General Counsel, who had forty days to respond. Id. The BOP officials at every level of appeal could, at their option, extend the time to respond if they thought it necessary: from twenty days to forty for the Warden, thirty days to sixty for the Regional Director, and forty days to sixty for the General Counsel. Id. The appeals process could thus take up to 160 days all told. Id.

"For inmates with terminal medical conditions and life expectancies of less than 1 year . . .

6

these timeliness standards likely provide[d] little to no meaningful opportunity to pursue an appeal." Id. The BOP's failure to timely resolve requests for compassionate release effectively denied relief even to defendants whose requests were initially approved. Between 2006 and 2011, twenty-eight defendants whose compassionate release requests had been approved by the Warden and Regional Director died waiting for the BOP Director to act. Id. at 11.

It was against the backdrop of this grim history that Congress enacted the First Step Act's amendments to § 3582(c)(1)(A). Congress's intent in amending the statute is clear. The title of the section containing the amendments was "Increasing the Use and Transparency of Compassionate Release." First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194 (2018). Senator Ben Cardin said, "The bill expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. Rec. S7774 (Dec. 18, 2018). Representative Jerry Nadler said, "The prison reform provisions of this bill . . . include a number of very positive changes, such as . . . improving application of compassionate release." 164 Cong. Rec. H10346, H10362 (Dec. 20, 2018). Congress's aim was to increase the number of defendants who received compassionate release. Hopwood, 41 Cardozo L. Rev. at 106.

It is just as apparent how Congress chose to achieve this goal. The First Step Act made no change to the substantive standard for compassionate release eligibility. Instead, it changed the process by which compassionate release could be obtained. Now, rather than having to brave the lengthy and uncertain process of requesting that the BOP make a motion for compassionate release on their behalf, defendants could, under the right circumstances, bring that motion themselves. And while the Act added an exhaustion requirement, the requirement came with an escape hatch. If the Warden of the defendant's facility failed to act for thirty days on a request for compassionate release, exhaustion was excused.

This Plea Agreement neatly undoes Congress's work. It closes the escape hatch and replaces it with an alternative likely to be just as if not more time consuming than exhaustion.[4] It

---

[4] Recall that before the First Step Act, the appeal process could take as long as 160 days. Inspector General Report at 29. The Plea Agreement's exhaustion exception requires Funez Osorto to wait 180 days to bring a motion for compassionate release. Plea Agreement ¶ 5.

7

restores the very obstacles the First Step Act removed and undermines the purpose of that law's amendments. Of course, a federal prosecutor is not required to draft plea agreements that reflect Congress's wishes. But since it is the Court's duty to effectuate congressional intent, the Court considers Congress's wishes an appropriate consideration in evaluating the Plea Agreement. The First Step Act received eighty-seven votes in the Senate, 358 votes in the House, and was signed into law by President Donald J. Trump. See Ames Grawert & Tim Lau, How the FIRST STEP Act Became Law — and What Happens Next, Brennan Center for Justice (Jan. 4, 2019), http://www.brennancenter.org/our-work/analysis-opinion/how-first-step-act-became-law-and-what-happens-next; Final Vote Results for Roll Call 448, House of Representatives, http://clerk.house.gov/evs/2018/roll448.xml (last visited May 8, 2020). It enjoyed broad bipartisan support from its inception. Shon Hopwood, The Effort to Reform the Federal Criminal Justice System, 128 Yale L.J. 791, 798–99 (2019). The Court cannot endorse this attempt by unelected federal prosecutors to unmake the work of elected representatives.

Although Congressional intent alone would be sufficient reason to reject the Plea Agreement, there is another reason that the compassionate release waiver renders it unacceptable. Plainly put, its effects are appallingly cruel. Compassionate release matters. It gives courts, defendants, and (in an ideal world) the Government the ability to account for the tragically unforeseeable: terminal illness, disability, the deaths of spouses and partners, and the deterioration of mental and physical health due to age. Current circumstances put the point in excruciatingly sharp relief. The Court has received requests for early release from multiple defendants who suffer from medical conditions that put them at high risk of death from COVID-19. See Order Granting Motion for Compassionate Release at 1, Reid, No. 17-cr-00175-CRB, ECF No. 554; Emergency Motion to Reduce Sentence at 2, Morrison, No. 18-cr-00238-CRB, ECF No. 63; Order Granting Compassionate Release at 3–4, Trent, No. 16-cr-00178-CRB, ECF No. 106. When these men were sentenced, nobody could have predicted that a relatively brief term of imprisonment could be rendered a death sentence by an unprecedented pandemic. But the unthinkable happened, and the compassionate release statute made it possible for the Court to adjust its sentences accordingly. See Order Granting Motion for Compassionate Release at 6, Reid, No. 17-cr-00175-

CRB, ECF No. 554; Order Granting Motion to Reduce Sentence, Morrison, No. 18-cr-00238-CRB, ECF No. 72; Order Granting Compassionate Release at 4, Trent, No. 16-cr-00178-CRB, ECF No. 106.

This is not to say that compassionate release only matters in a crisis. The unthinkable happens every day, albeit on a personal rather than global scale. A terminal diagnosis. The death of a parent caring for his or her children alone while their other parent is imprisoned. An accident that renders a person unable to feed, bathe, or move without assistance. Compassionate release exists to address these calamities as well.

It is no answer to say that Funez Osorto is striking a deal with the Government, and could reject this term if he wanted to, because that statement does not reflect the reality of the bargaining table. See Erik Luna & Marianne Wade, Prosecutors as Judges, 67 Wash. & Lee L. Rev. 1413, 1414–15 (2010). As to terms such as this one, plea agreements are contracts of adhesion. The Government offers the defendant a deal, and the defendant can take it or leave it. Id. ("American prosecutors . . choose whether to engage in plea negotiations and the terms of an acceptable agreement."). If he leaves it, he does so at his peril. And the peril is real, because on the other side of the offer is the enormous power of the United States Attorney to investigate, to order arrests, to bring a case or to dismiss it, to recommend a sentence or the conditions of supervised release, and on and on. See Robert H. Jackson, The Federal Prosecutor, 24 J. Am. Judicature Soc'y 18, 18 (1940). Now imagine the choice the Government has put Funez Osorto to. All that power—and the all too immediate consequences of opposing it—weighed against the chance to request release in desperate and unknowable circumstances that may not come to pass. That Faustian choice is not really a choice at all for a man in the defendant's shoes. But the Court has a choice, and it will not approve the bargain.

That leaves only one question, which is why? Why would federal prosecutors exercise the tremendous discretion entrusted to them with such a lack of compassion? Defendants released through the compassionate release program are less than a tenth as likely to recidivate as the average federal prisoner. Inspector General Report at 49–50. And the Department of Justice itself estimates that broader use of compassionate release could save taxpayers millions and free

desperately needed space in BOP facilities. Id. at 45–48. The waiver of compassionate release is senseless.

IV. **CONCLUSION**

The Plea Agreement is rejected.

**IT IS SO ORDERED.**

Dated: May 11, 2020

CHARLES R. BREYER
United States District Judge